No. 97-455

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 248

296 Mont. 207

988 P.2d 1236

MONTANA ENVIRONMENTAL

INFORMATION CENTER; CLARK FORK-

PEND OREILLE COALITION; and

WOMEN'S VOICE FOR THE EARTH,

Plaintiffs and Appellants,

v.

DEPARTMENT OF ENVIRONMENTAL QUALITY,

Defendant and Respondent,

and

SEVEN-UP PETE JOINT VENTURE,

Defendant-Intervenor and Respondent.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Jeffrey Sherlock, Judge presiding.

COUNSEL OF RECORD:

**For Appellants:**

Thomas M. France (argued), National Wildlife Federation;

Missoula, Montana

David K. Wilson, Reynolds, Motl & Sherwood; Helena, Montana

**For Respondents:**

Rebecca W. Watson (argued), and Alan L. Joscelyn,

Gough, Shanahan, Johnson & Waterman; Helena, Montana

John North (argued), and Richard R. Thweatt, Montana

Department of Environmental Quality; Helena, Montana

For Amici:

Frank C. Crowley and Colleen Coyle, Doney, Crowley &

Bloomquist, P.C.; Helena, Montana

Karl J. Englund, Attorney at Law; Missoula, MT 59807-8358

William A. Rossbach and Elizabeth A. Brennan, Attorneys at Law;

Missoula, MT 59807-8988

Jack R. Tuholske, Attorney at Law; Missoula, Montana

Matthew O. Clifford, Beers Law Offices; Missoula, Montana

Argued and Submitted On: September 10, 1998

Decided: October 20, 1999

Filed:

_____

Clerk

2

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1.The Plaintiffs, Montana Environmental Information Center (MEIC), Clark Fork-Pend Oreille Coalition, and Women's Voices for the Earth, filed an amended complaint in the District Court for the First Judicial District in Lewis and Clark County in which the Department of Environmental Quality (DEQ) for the State of Montana was named as the Defendant and in which Seven-Up Pete Joint Venture (SPJV) subsequently intervened. Plaintiffs alleged, among other claims, that to the extent § 75-5-317(2)(j), MCA (1995) allows discharges of water from watering well or monitoring well tests, which degrade high quality waters without review pursuant to Montana's nondegradation policy found at § 75-5-303(3), MCA (1995), that statute is void for a violation of Article IX, Section 1(1) and (3) of the Montana Constitution. Plaintiffs sought an injunction suspending the exploration license that had been issued by DEQ to SPJV for pump tests to be performed at the site of its proposed gold mine. Both parties moved for summary judgment and following the submission of affidavits and oral testimony, the District Court held that absent a finding of actual injury, § 75-5-317(2)(j), MCA (1995) was not unconstitutional as applied and entered judgment for the DEQ. The Plaintiffs appeal from the judgment of the District Court. We reverse and remand for further review consistent with this opinion.**

**¶2.The issue on appeal is whether the Plaintiffs have demonstrated standing to challenge the constitutionality of § 75-5-317(2)(j), MCA (1995), and, if so, whether the statute implicates either Article II, Section 3 or Article IX, Section 1 of the Montana Constitution.**

## FACTUAL BACKGROUND

**¶3.The following facts are taken from those allegations in the Plaintiffs' complaint and amended complaint which are uncontroverted by DEQ's answer and from testimony and exhibits offered in the District Court.**

¶4.MEIC is a nonprofit organization, whose members live primarily in Montana and are actively involved in issues related to the protection and enhancement of water quality and fish and wildlife habitat. The Clark Fork-Pend Oreille Coalition is a nonprofit corporation whose members reside primarily in the Clark Fork drainage of Montana and Idaho and who, for the past ten years, have worked to improve water quality in the Clark Fork drainage. Women's Voice for the Earth is also a nonprofit organization based in Missoula, Montana and is dedicated to protecting biological diversity in the northern Rockies. Members of all three organizations, float, fish, hunt, and view wildlife on the Blackfoot River and on public and private lands adjoining the Blackfoot River. Furthermore, the Blackfoot River is a major tributary to the Clark Fork River.

¶5.The Defendant, Montana Department of Environmental Quality is the State agency in charge of protecting water quality and issuing permits to hard rock mines. In doing so, it is obligated to comply with the Montana Environmental Policy Act, §§ 75-1-101, et seq., MCA, the Montana Water Quality Act, §§ 75-5-301, et seq., MCA, and the Montana Constitution.

¶6.Seven-Up Pete Joint Venture has submitted an application for a massive open-pit gold mine in the upper Blackfoot River valley, near the confluence of the Landers Fork and Blackfoot Rivers. Plaintiffs' complaint alleged that in the summer of 1995, DEQ illegally amended SPJV's mineral exploration license to allow for the discharge of groundwater containing high levels of arsenic and zinc into the shallow aquifers of the Blackfoot and Landers Fork Rivers, without requiring nondegradation review pursuant to § 75-5-303(3), MCA (1995), and to the extent that it was authorized to do so, pursuant to § 75-5-31(2)(j), MCA (1995), the latter statute violates the right to a clean and healthy environment guaranteed by Article II, Section 3 of Montana's Constitution, and the clear nondegradation policy established by Article IX, Section 1 of Montana's Constitution.

¶7.The Blackfoot River provides habitat for many different species of fish and wildlife, including important habitat for the imperiled Bull Trout, a species which qualifies for listing as an endangered species pursuant to 16 U.S.C. §§ 1531, et seq. The Landers Fork River is an important tributary of the Blackfoot in terms of both water flow and fish habitat. In particular, it provides critical spawning and rearing habitat for Bull Trout.

¶8.In 1992 SPJV applied for an exploration license pursuant to the Metal Mine Reclamation Act, §§ 82-4-301, et seq., MCA, and was issued exploration license No. 00497, which authorized it to collect geophysical information and generally explore the mineral formations associated with the proposed mine. However, on June 2, 1995, SPJV submitted a new work plan which included extended pumping of underground water at the proposed mine site and sought approval for the pumping pursuant to its exploration license. The pumping is apparently intended to provide data necessary to determine the long-term response to dewatering at the McDonald Gold Mine Project. Pursuant to the proposal, groundwater was to be pumped from the bedrock aquifer and discharged into two infiltration galleries–one located in the Blackfoot River alluvium and one located in the Landers Fork River alluvium.

¶9.Although SPJV's application to amend its exploration license was initially approved, DEQ later realized that the water to be pumped from the bedrock and discharged into the Blackfoot and Landers Fork alluvia, contained concentrations of some constituents including arsenic at greater concentrations than existed in the receiving water. Therefore, the initial approval was rescinded until SPJV proposed and DEQ agreed that areas in the Blackfoot and Landers Fork alluvia could serve as mixing zones for the discharged water in order to bring the discharges into compliance with State law. A groundwater mixing zone is a portion of the aquifer receiving a discharge where water quality standards may be exceeded in order to allow mixing with the receiving water to occur. *See* § 75-5-103(18), MCA.

¶10.Formal authorization for the proposed discharges into the Blackfoot and Landers Fork alluvia was issued by DEQ on August 10, 1995.

¶11.Officials at DEQ determined that the mixing zone in the Blackfoot alluvial aquifer could extend 5000 feet down gradient from the Blackfoot infiltration gallery and the mixing zone in the Landers Fork alluvial aquifer could extend 4000 feet down gradient from the Landers Fork infiltration gallery. They estimated that arsenic would be diluted to meet water quality standards by the time the discharge had gone 2000 feet from the Blackfoot infiltration gallery and 1500 feet from the Landers Fork infiltration gallery.

¶12.DEQ determined that water from the Blackfoot mixing zone would not enter the surface water of the Blackfoot River but that water from the Landers Fork mixing zone would discharge to the surface waters of that river. However, DEQ concluded

that all chemical constituents in the groundwater would be diluted below applicable water quality standards prior to discharge to the Landers Fork surface waters.

¶13. The background level of arsenic in the groundwater of the Blackfoot and Landers Fork alluvium in the vicinity of the well test discharges is no more than .003 milligrams per liter (mg/l). The expected level of arsenic in the water at the wellhead from the three water wells tested in 1995, was expected to be .018 mg/l for well No. 4, .055 mg/l for well No. 5, and .036 mg/l for well No. 6. Water wells Nos. 4 and 5 discharged to the Blackfoot infiltration gallery and water well No. 6 to the Landers Fork infiltration gallery.

¶14. The actual levels of arsenic at the wellhead for wells tested in 1995 ranged from .016 to .025 mg/l for well No. 4; .035 to .056 mg/l for well No. 5; and .024 to .039 mg/l for well No. 6. The actual level of arsenic reaching the Blackfoot infiltration gallery during the 1995 test ranged from .015 to .020 mg/l and the actual level of arsenic reaching the Landers Fork gallery ranged from .018 to .020 mg/l due to chemical changes caused by the atmosphere.

¶15. The 1995 well tests involved the pumping and discharge of 740 gallons of underground water per minute to the Blackfoot alluvium and 240 gallons of underground water per minute to the Landers Fork alluvium. The duration of the tests was four months.

¶16. However, samples taken during and after the 1995 well tests from monitoring wells located at a point approximately 4000 feet down gradient from the infiltration galleries, showed no change in the Blackfoot, and no significant change in the Landers Fork alluvia, from the background level of arsenic.

¶17. Plaintiffs brought this action on October 6, 1995, and alleged that they have been damaged by the discharge of polluted water to the Blackfoot and Landers Fork Rivers. They sought a writ of mandamus compelling DEQ to comply with various statutory procedures prior to amendment of the exploration license. In particular, Plaintiffs sought an order requiring SPJV to comply with the nondegradation requirements found at § 75-5-303(3), MCA, and to the extent that they were not required to do so, based on the waiver found at § 75-5-317(2)(j), MCA, (1995), Plaintiffs sought a declaratory judgment that the latter statute was unconstitutional and an injunction ordering DEQ to suspend amended exploration license No. 00497.

¶18.In support of their complaint, Plaintiffs offered testimony from Dan L. Fraser, a registered professional engineer, and environmental consultant who worked for the Water Quality Bureau of the Montana State Department of Health and Environmental Sciences (DHES) from 1976 to 1993 and who was the bureau chief from 1990 to 1993. DHES was the state agency which administered Montana's Water Quality Act before that responsibility was given to DEQ. Fraser testified that the Montana numeric water quality standard for protection of health from arsenic is .018 milligrams per liter (mg/l) but that based on his review of data submitted by SPJV to DEQ in support of its application for permission to conduct pumping tests, water with higher levels of arsenic would be discharged to the Blackfoot and Landers Fork alluvia during pumping. He testified that arsenic is a carcinogen which causes skin cancer to humans and that the EPA has found evidence of an association between internal cancer and arsenic.

¶19.Fraser acknowledged that in 1995 the Water Quality Act (§ 75-5-317(2)(j), MCA) was amended to deem certain activities including water well and monitoring well tests "nonsignificant" and allow them to proceed without the form of review which would otherwise be required for degradation of the State's waters. However, it was his opinion that the discharges proposed by SPJV were not "nonsignificant" in reality and that the permit issued by DEQ did not take into account public health risks associated with the discharge of arsenic. It was his opinion that any increase of arsenic content in drinking water is likely to cause an increase in the risk of cancer to those who consume it.

¶20.James Volberding is the senior project geologist for SPJV and has a degree in geological engineering. He is responsible for supervising the hydrologic studies connected to the proposed McDonald Gold Mine Project. Those studies include the well pump tests at issue.

¶21.Volberding explained that construction of the mine will require the groundwater levels in the vicinity of the mine to be temporarily lowered by a system of wells which will provide water for the mining operations and prevent flooding of the mine workings. The three wells involved in the current tests were constructed in 1993 to provide the necessary data by a series of pump tests regarding the chemistry and volume of water in the groundwater systems. Pumping from the three wells commenced on July 26, 27, and 28, 1995, and by October 11, monitoring data was available regarding the water being pumped and the effect that it had on the surface

of the two rivers. He explained that the arsenic load of the discharged water was less than had been expected and while acknowledging that it exceeded the level of the receiving water at the point of discharge, testified that it will be close to nondetectable below the mixing zone of the Landers Fork alluvium and will contain .005 mg/l of arsenic immediately below the mixing zone for the Blackfoot River alluvium compared to .003 mg/l of arsenic for the receiving water. He testified that arsenic concentrations in other Montana waters used for drinking by individuals are higher.

¶22.Joe Gurrieri is a hydrologist with the Reclamation Division of the Hard Rock Bureau of the DEQ. It is his responsibility, in that capacity, to review mining plans as they relate to hydrology. In that capacity he was familiar with the facts that pertained to SPJV's pump tests. Based on the data provided by SPJV he concluded that there was no beneficial use of water which would be interfered with by the proposed mixing zones and that neither the biological resources of the Blackfoot River nor recreational use of the river would be affected. He determined that by the end of the mixing zones, all constituents of the pumped water, including arsenic, would be below human health standards and would not present a problem in terms of toxicity.

¶23.Gurrieri calculated that the concentration of arsenic at a point 3000 feet down gradient from the Landers Fork infiltration gallery would be .008 mg/l and that the arsenic concentration 5000 feet down gradient from the Blackfoot infiltration gallery would be .009 mg/l. These concentrations are lower than the standards for groundwater or surface water but greater than the concentrations in the receiving water.

¶24.Geoffrey Beale, a hydrologist employed by SPJV also agreed that the water pumped from underground had higher concentrations of arsenic than the water into which it would be received, but testified that at some point downstream from the point of discharge the arsenic level will be diluted sufficiently, that it will not affect the arsenic level of the background water.

¶25.In support of their motion for summary judgment, the Plaintiffs contended that pursuant Article II, Section 3 and Article IX, Section 1 of the Montana Constitution and § 75-5-303(3), MCA (1995), the State may not allow degradation of high quality waters without making the necessary showings required by the degradation review

process set forth in the statute; that "degradation" includes increasing the concentration of arsenic in high quality waters; (both parties agree the waters in question are "high quality" waters) and that to the extent that water well tests are arbitrarily excluded from review, pursuant to § 75-5-317(2)(j), MCA (1995), that statute offends Montana's constitution and the government must demonstrate both a compelling state interest for doing so, that the waiver provided for is closely tailored to effectuate only that interest and that it is the least onerous path available.

¶26. In opposition to the Plaintiffs' motion for summary judgment and in support of DEQ's motion, DEQ and SPJV pointed out that at a short distance from the points of discharge there were no changes from background levels of arsenic, that therefore, Plaintiffs have not demonstrated violation of their right to a clean and healthful environment, and for that reason, strict scrutiny of the blanket waivers provided for by § 75-5-317, MCA (1995) is not required. Furthermore, they alleged that for Plaintiffs to have standing to challenge § 75-5-317, MCA, they must demonstrate injury in fact and they have not done so because they have failed to demonstrate that either their health or the environmental health has been harmed by the discharges in question.

¶27. In reply, Plaintiffs pointed out that Rule 16.20.712(1)(b), ARM (now Rule 17.30.715(1)(b), ARM), classifies any discharge of carcinogens in excess of those levels present in the background water as significant and that therefore, they have demonstrated all the harm necessary to establish standing and to require strict scrutiny of the statute which provides blanket exemption for that type of discharge from nondegradation review. In essence, Plaintiffs argued that § 75-5-317, MCA, which does not permit consideration of how a discharge might degrade water quality, cannot be said to meet the constitutional requirement for maintaining our current quality of environment.

¶28. The District Court held that Article II, Section 3 of the Montana Constitution does provide a fundamental right to a clean and healthy environment, and that parties such as the Plaintiffs are entitled to bring a direct action in court to enforce that right. The District Court interpreted the Plaintiffs' challenge to § 75-5-317, MCA (1995) as an "applied" challenge based on the fact that Plaintiffs do not contend the statute is unconstitutional in all conceivable applications. However, the District Court held that before strict scrutiny applies, Plaintiffs must demonstrate that a right guaranteed by the constitution has been abridged and that in this case

they did not do so because:

¶29.a There is no proof that discharges from the mixing zones (as opposed to discharges from the ground) exceeded water quality standards;

¶30.b Plaintiffs have demonstrated no significant changes to the quality of water on either the surfaces of the Landers Fork or Blackfoot Rivers;

¶31.c Before a constitutional violation can be shown, Plaintiffs must demonstrate that the waters of the Blackfoot and Landers Fork are so affected that public health is threatened or applicable water quality standards are violated to the extent that there is a significant impact on either river. Absent a finding of actual injury, as defined, § 75-5-317, MCA, is not unconstitutional as applied.

¶32.In an order denying the Plaintiffs' request for an order temporarily restraining further pumping tests, the District Court noted the following factual findings which formed the basis for its conclusions:

¶33.a The existing level of arsenic in the Landers Fork River is .0015 mg/l. The State expected the arsenic in the well water which was to be discharged into the infiltration gallery to be at a level of .014 mg/l and be reduced to .006 mg/l by the end of the mixing zone.

¶34.b SPJV, however, concluded that the level of arsenic discharged into the infiltration galleries is .009 mg/l, far below the standard for aquatic life and the human health standard and that there will be no detectable change in the ambient level of arsenic in water 50 feet downstream from the point of discharge.

¶35.c Based on these figures, there is no evidence of threat to public health, no violation of water quality standards, and no significant impact on the Landers Fork River or the Blackfoot River.

¶36.The District Court originally held, however, that based upon the affidavit of Dan Fraser there was an issue of fact which could not be resolved by summary judgment. The Plaintiffs later asked the Court to either reconsider its order based on the amount of arsenic at the point of discharge or enter a final order based on the facts which the court currently assumed to be true. The District Court did so; it denied the

Plaintiffs' motion for summary judgment, granted the DEQ's motion and dismissed the Plaintiffs' complaint.

¶37.On appeal, Plaintiffs contend that when the legislature amended the Water Quality Act, by enacting § 75-5-317(2)(j), MCA (1995), to exclude certain activities from review pursuant to the act's nondegradation policy, the blanket exclusion is unconstitutional when the facts show, as they did here, that degradation will occur. Plaintiffs contend that because Montanans have a fundamental right to a clean and healthful environment pursuant to Article II, Section 3 of the Montana Constitution, the provisions of the amendment must be strictly scrutinized for not only a compelling state interest, but also to assure that the amendment is closely tailored to effectuate the government's interest by the least onerous path available and that the District Court erred by refusing to apply strict scrutiny absent a demonstration of risk to human or environmental health because Montana's Constitution, in particular, Article IX, Section 1, is intended to prevent pollution before it occurs. Plaintiffs contend that all they needed to demonstrate was that the concentration of arsenic, a known carcinogen, as it came out of the well, was greater than the carcinogen in the receiving water because the State has already determined pursuant to Rule 17.30.715(1)(b), ARM that discharges of that nature are significant enough to require nondegradation review pursuant to § 75-5-303, MCA. Plaintiffs request that this Court remand to the District Court for a determination of whether exemption from nondegradation review is constitutional. However, they do not suggest that nondegradation review satisfies the constitutional requirement of a clean and healthful environment under all circumstances. They simply contend that it is the minimum that is required as applied to the facts in this case.

¶38.The DEQ and SPJV respond that because the District Court correctly found that arsenic levels returned to ambient standards within 50 feet from the point of discharge of the well water, Plaintiffs have not sustained their burden of proving they are threatened with injury by the enactment of § 75-5-317(2)(j), MCA, and therefore, have no standing to challenge the statute. They also contend that the constitutional provisions in question were not intended to prohibit all discharges of water which include arsenic but only those which render the receiving water unclean or unhealthy and that neither condition was proven in this case. Finally, the Respondents contend that § 75-5-317(2)(j), MCA, did not waive nondegradation review for discharges deemed significant by Rule 17.30.715, ARM, but that it simply codified those categories already deemed nonsignificant by Rule 17.30.716, ARM.

## ISSUE

¶39. The issue on appeal is whether the Plaintiffs have demonstrated standing to challenge the constitutionality of § 75-5-317(2)(j), MCA (1995), and, if so, whether the statute implicates either Article II, Section 3 or Article IX, Section 1 of the Montana Constitution.

## DISCUSSION

### Standard of Review

¶40. The District Court held that based on the facts presented to it, Plaintiffs had not established that § 75-5-317(2)(j), MCA (1995), violates Montana's Constitution. We review a district court's constitutional conclusions as we do other issues of law to determine whether they are correct. *See Wadsworth v. State* (1996), 275 Mont. 287, 298, 911 P.2d 1165, 1171.

### Standing

¶41. In *Gryczan v. State* (1997), 283 Mont. 433, 442-43, 942 P.2d 112, 118, we held that the following criteria must be satisfied to establish standing: (1) the complaining party must clearly allege past, present, or threatened injury to a property or civil right; and (2) the alleged injury must be distinguishable from the injury to the public generally, but the injury need not be exclusive to the complaining party.

¶42. In *Missoula City-County Air Pollution Control Board v. Board of Environmental Review* (1997), 282 Mont. 255, 937 P.2d 463, this Court considered the first prong of the two-part test and concluded that a threatened injury to the Local Board had been established by demonstrating "potential economic injury." *Missoula City-County Air Pollution Control Bd.*, 282 Mont. at 262-63, 937 P.2d at 468. The court accepted the Local Board's argument that "it face[d] potential economic harm from the additional expenses necessary to monitor, collect and analyze data, and to develop a regulatory response which will ensure that Missoula air quality meets minimum federal standards in the face of increased air pollution from Stone Container." *Missoula City-County Air Pollution Control Bd.*, 282 Mont. at 262, 937 P.2d at 468.

¶43. The second prong of the test for standing requires that the litigant distinguish his

or her injury from injury to the general public. *Gryczan*, 283 Mont. at 442, 942 P.2d at 118. However, the injury need not be exclusive to the litigant. *Gryczan*, 283 Mont. at 443, 942 P.2d at 118. In *Gryczan* we held that the plaintiffs had satisfied the second prong because they "presented evidence of specific psychological effects caused by the statute." We further found it significant that "to deny Respondents standing would effectively immunize the statute from constitutional review." *Gryzcan*, 283 Mont. at 446, 942 P.2d at 120.

¶44.In *Missoula City-County Air Pollution Control Board* we held that the Local Board's "interest in the effective discharge of the obligations imposed upon it by law is the equivalent of the personal stake which would support standing of a private citizen of the Missoula airshed." *Missoula City-County Air Pollution Control Bd.*, 282 Mont. at 262, 937 P.2d at 467. We further stated that:

> It is clear to this Court that a citizen of Missoula, as one who breathes the air into which Stone Container is expelling pollutants, would have standing to bring this action . . . . In the same way as a citizen of the Missoula airshed is more particularly affected by the State Board's acts than is a citizen of another area, the interest of the Local Board is distinguishable from and greater than the interest of the public generally.

*Missoula City-County Air Pollution Control Bd.*, 282 Mont. at 262, 937 P.2d at 467-68.

¶45.Based on these criteria, we conclude that the allegations in the Plaintiffs' complaint which are uncontroverted, established their standing to challenge conduct which has an arguably adverse impact on the area in the headwaters of the Blackfoot River in which they fish and otherwise recreate, and which is a source for the water which many of them consume. Whether Plaintiffs have demonstrated sufficient harm from the statute and activity complained of to implicate their constitutional rights and require strict scrutiny of the statute they have challenged, is a separate issue.

Constitutional and Statutory Framework

¶46.Appellants contend that § 75-5-317(2)(j), MCA (1995), violates their rights guaranteed by Article II, Section 3 and Article IX, Section 1 of the Montana Constitution.

**¶47.Article II, Section 3 provides in relevant part that:**

> All persons are born free and have certain inalienable rights. They include the right to a clean and healthful environment . . . .

Mont. Const. art. II, § 3.

**¶48.Article IX, Section 1 provides in relevant part as follows:**

> (1) The State and each person shall <u>maintain and improve</u> a clean and healthful environment in Montana for present and future generations.

> . . . .

> (3) The legislature shall provide adequate remedies for the protection of the environmental life support system <u>from degradation</u> and provide adequate remedies to <u>prevent unreasonable depletion and degradation</u> of natural resources.

Mont. Const. art. IX, § 1 (emphasis added).

**¶49.Although enacted prior to the constitutional provisions relied on, the Plaintiffs contend that the nondegradation policy for high quality waters established by § 75-5-303, MCA, of Montana's Water Quality Act is reasonably well designed to meet the constitution's objectives and that it is the minimum requirement which must be satisfied for a discharge which degrades the existing quality of Montana water. The relevant portions of that statute provide:**

> (1) Existing uses of state waters and the level of water quality necessary to protect those uses must be maintained and protected.

> (2) Unless authorized by the department under subsection (3) or exempted from review under 75-5-317, the quality of high quality waters must be maintained.

> (3) The department may not authorize degradation of high quality waters unless it has been affirmatively demonstrated by a preponderance of evidence to the department that:

> (a) degradation is necessary because there are no economically, environmentally,

and technologically feasible modifications to the proposed project that would result in no degradation;

(b) the proposed project will result in important economic or social development and that the benefit of the development exceeds the costs to society of allowing degradation of high quality waters;

(c) existing and anticipated use of state waters will be fully protected; and

(d) the least degrading water quality protection practices determined by the department to be economically, environmentally, and technologically feasible will be fully implemented by the applicant prior to and during the proposed activity.

§ 75-5-317, MCA (1995).

**¶50.Plaintiffs contend that the Constitution's environmental protections were violated by the legislature in 1995, when it amended § 75-5-317(2)(j), MCA to provide a blanket exception to the requirements of nondegradation review for discharges from water well or monitoring well tests without regard to the harm caused by those tests or the degrading effect that the discharges have on the surrounding or recipient environment. Section 75-5-317(2)(j), MCA (1995), provides in relevant part as follows:**

(1) The categories or classes of activities identified in subsection (2) cause changes in water quality that are nonsignificant because of their low potential for harm to human health or the environment and their conformance with the guidance found in 75-5-301(5)(c).

(2) The following categories or classes of activities are not subject to the provisions of 75-5-303:

. . . .

(j) discharges of water from water well or monitoring well tests . . . conducted in accordance with department- approved water quality protection practices . . . .

¶51. Plaintiffs contend that the groundwater discharged into the alluvia of the Landers Fork and Blackfoot Rivers and ultimately to the alluvial aquifers and the surface water of at least the Landers Fork River, degraded high quality waters by definition as established by the Department or its predecessor through A.R.M. 17.30.715(1)(b), which provides as follows:

> (1) The following criteria will be used to determine whether certain activities or classes of activities will result in nonsignificant changes in existing water quality due to their low potential to affect human health or the environment. These criteria consider the quantity and strength of the pollutant, the length of time the changes will occur, and the character of the pollutant. Except as provided in (2) of this rule, changes in existing surface or groundwater quality resulting from the activities that meet all the criteria listed below are nonsignificant, and are not required to undergo review under 75-5-303, MCA:
>
> . . . .
>
> (b) discharges containing carcinogenic parameters . . . at concentrations less than or equal to the concentrations of those parameters in the receiving water . . . .

¶52. Because discharges containing carcinogenic parameters, (i.e., discharged water containing concentrations of arsenic equal to .009 mg/l) greater than those in the receiving water (i.e., .003 mg/l) were allowed in this case, Plaintiffs contend that the discharges should not have been exempt from nondegradation review by DEQ's own standards and that they have, therefore, demonstrated the necessary harm for strict scrutiny of the blanket exemption provided for in § 75-5-317(2)(j), MCA.

¶53. DEQ and SPJV on the other hand, contend that even before the 1995 amendment to § 75-5-317, MCA, which exempted well tests from nondegradation review, well tests were exempted from nondegradation review by ARM 16.20.713(i), the predecessor to what is currently ARM 17.30.716, which incorporates the exemptions found at § 75-5-317(2)(j), MCA by reference.

## Constitutional Analysis

¶54. In order to address the issue raised on appeal, it is necessary that we determine the threshold showing which implicates the rights provided for by Article II, Section 3 and Article IX, Section 1 of the Montana Constitution and the level of scrutiny to be applied to each provision. DEQ and SPJV contend, and the District Court agreed that actual danger to human health or the health of the environment must first be demonstrated. The Plaintiffs contend that Montana's constitutional provisions are intended to prevent harm to the environment; that degradation to the environment is all that need be shown; and that degradation was established in this case based on the DEQ's own adopted standard.

¶55. We have not had prior occasion to discuss the level of scrutiny which applies when the right to a clean and healthful environment guaranteed by Article II, Section 3 or those rights referred to in Article IX, Section 1 are implicated. Nor have we previously discussed the showing which must necessarily be made to establish that rights guaranteed by those two constitutional provisions are implicated. However, our prior cases which discuss other provisions of the Montana Constitution and the debate of those delegates who attended the 1972 Constitutional Convention, guide us in both respects.

¶56. In *Butte Community Union v. Lewis* (1986), 219 Mont. 426, 712 P.2d 1309, we held that:

> If a fundamental right is infringed or a suspect classification established, the government has to show a "compelling state interest" for its action.
>
> . . . .
>
> . . . in order to be fundamental, a right must be found within Montana's Declaration of Rights or be a right "without which other constitutionally guaranteed rights would have little meaning." *In the Matter of C.H.* (Mont. 1984), [210 Mont. 184], 683 P.2d 931, 940, 41 St.Rep. 997, 1007.

*Butte Community Union*, 219 Mont. at 430, 712 P.2d at 1311.

¶57. We held, however, that a middle-tier level of scrutiny will be applied when a right is implicated which, though not contained in our declaration of rights, is referred to in our constitution even though the constitutional provision in question is

**merely directive to the legislature. We held that:**

> A benefit lodged in our State Constitution is an interest whose abridgement requires something more than a rational relationship to a governmental objective.
>
> . . . .
>
> . . . Where constitutionally significant interests are implicated by governmental classification, arbitrary lines should be condemned. Further, there should be balancing of the rights infringed and the governmental interest to be served by such infringement.

*Butte Community Union*, 219 Mont. at 434, 712 P.2d at 1313-14.

**¶58.We held that when a government classification is challenged as a violation of equal protection and a constitutionally significant interest is implicated, middle-tier scrutiny requires that the State demonstrate two factors: "(1) that its classification . . . is reasonable; and (2) that its interest in classifying . . . is more important than the people's interest in obtaining [constitutionally significant benefits]."** *Butte Community Union*, **219 Mont. at 434, 712 P.2d at 1314.**

**¶59.We elaborated on the level of scrutiny for statutes or rules which implicate rights guaranteed in our declaration of rights in** *Wadsworth v. State* **(1996), 275 Mont. 287, 911 P.2d 1165. There we held that, "the inalienable right to pursue life's basic necessities is stated in the Declaration of Rights and is therefore a fundamental right."** *Wadsworth*, **275 Mont. at 299, 911 P.2d at 1172.**

**¶60.We also held in** *Wadsworth* **that the nature of interest affected by state action dictates the standard of review that we apply and that: "[t]he most stringent standard, strict scrutiny, is imposed when the action complained of interferes with the exercise of a fundamental right or discriminates against a suspect class."** *Wadsworth*, **257 Mont. at 302, 911 P.2d at 1174 (citations omitted).**

**¶61.In** *Wadsworth*, **we gave the following explanation of what is required by strict scrutiny:**

> Strict scrutiny of a legislative act requires the government to show a compelling state interest for its action. *Shapiro*, 394 U.S. at 634, 89 S. Ct. 1331. When the

government intrudes upon a fundamental right, any compelling state interest for doing so must be closely tailored to effectuate only that compelling state interest. *Pastos*, 887 P.2d at 202 (citing *Zablocki v. Redhail* (1978), 434 U.S. 374, 98 S. Ct. 673, 54 L. Ed. 2d 618). In addition to the necessity that the State show a compelling state interest for invasion of a fundamental right, the State, to sustain the validity of such invasion, must also show that the choice of legislative action is the least onerous path that can be taken to achieve the state objective. *Pfost v. State* (1985), 219 Mont. 206, 216, 713 P.2d 495, 505.

*Wadsworth*, 275 Mont. at 302, 911 P.2d at 1174.

**¶62.Finally, in language relevant to this case, we held in *Wadsworth* that, "while DOR's conflict of interest policy or rule is at issue rather than a statute, we, nevertheless, apply strict scrutiny analysis since the operation of that rule implicates Wadsworth's fundamental right to the opportunity to pursue employment." *Wadsworth*, 275 Mont. at 303, 911 P.2d at 1174 (emphasis added).**

**¶53.Applying the preceding rules to the facts in this case, we conclude that the right to a clean and healthful environment is a fundamental right because it is guaranteed by the Declaration of Rights found at Article II, Section 3 of Montana's Constitution, and that any statute or rule which implicates that right must be strictly scrutinized and can only survive scrutiny if the State establishes a compelling state interest and that its action is closely tailored to effectuate that interest and is the least onerous path that can be taken to achieve the State's objective.**

**¶54.State action which implicates those rights provided for in Article IX, Section 1 would normally not be subject to strict scrutiny because those rights are not found in Montana's Declaration of Rights. Those rights would normally be subject to a middle-tier of scrutiny because lodged elsewhere in our state constitution. However, we conclude that the right to a clean and healthful environment guaranteed by Article II, Section 3, and those rights provided for in Article IX, Section 1 were intended by the constitution's framers to be interrelated and interdependent and that state or private action which implicates either, must be scrutinized consistently. Therefore, we will apply strict scrutiny to state or private action which implicates either constitutional provision.**

**¶55.A thorough review of the discussion and debate among the delegates to our 1972**

Constitutional Convention leads us to the further conclusion that the nature of the environmental rights provided by Articles II and IX cannot be interpreted separately, but that it was the delegates' intention that the two provisions compliment each other and be applied in tandem. Therefore, we look to the records of the convention discussion and debate to determine the showing that must be made before the rights are implicated and strict scrutiny applied.

¶56.Article IX, Section 1 was reported to the floor of the constitutional convention by the Natural Resources and Agricultural Committee on March 1, 1972. *Montana Constitutional Convention*, Vol. IV at 1198-99. As originally proposed, however, Article IX, Section 1(1) required that "the state and each person . . . maintain and enhance the Montana environment for present and future generations." *Montana Constitutional Convention*, Vol. IV at 1200, March 1, 1972. It did not provide, as does the current provision, the obligation to "maintain and improve a clean and healthful environment." *See Montana Constitutional Convention*, Vol. IV at 1200, March 1, 1972; Mont. Const. art. IX, § 1(1). The provision, as introduced, was thought by members of the committee to be the strongest environmental protection provision found in any state constitution. *Montana Constitutional Convention*, Vol. IV at 1200, March 1, 1972. Delegate McNeil explained that descriptive adjectives were not included preceding the word environment such as healthful or unsoiled, because the majority felt that the current Montana environment encompassed all of those descriptive adjectives. *Montana Constitutional Convention*, Vol. IV at 1200, March 1, 1972. He further explained that descriptive adjectives were not originally included because:

> The majority felt that the use of the word "healthful" would permit those who would pollute our environment to parade in some doctors who could say that if a person can walk around with four pounds of arsenic in his lungs or SO2 gas in his lungs and wasn't dead, that that would be a healthful environment. We strongly believe–the majority does–that our provision–or proposal is stronger than using the word "healthful."

*Montana Constitutional Convention*, Vol. IV at 1201, March 1, 1972.

¶57.In discussing the interrelationship of subsections (1) and (3), Delegate McNeil stated:

Subsection (3) mandates the Legislature to provide adequate remedies to protect the environmental life-support system from degradation. The committee intentionally avoided definitions, to preclude being restrictive. And the term "environmental life support system" is all-encompassing, including but not limited to air, water, and land; and whatever interpretation is afforded this phrase by the Legislature and courts, there is no question that it <u>cannot be degraded</u>.

*Montana Constitutional Convention*, Vol. IV at 1201, March 1, 1972 (emphasis added).

**¶58. There were delegates including Delegate Campbell who felt that without descriptive adjectives, such as "clean and healthful" prior to the term "environment," Article IX, Section 1 lacked the force that the majority had intended.** *Montana Constitutional Convention*, **Vol. IV at 1204, March 1, 1972. However, the proponents of Section 1 as introduced, insisted that the subsection require that the environment not only be maintained but improved.** *See* **Delegate John Anderson cmts. (***Montana Constitutional Convention***, Vol. IV at 1204, March 1, 1972).**

**¶59. Delegate McNeil explained the committee's concern about including "clean and healthful" as follows:**

[T]he majority felt this would permit degradation of the present Montana environment to a level as defined in Illinois, which may be clean and healthful. <u>And our intention was to permit no degradation</u> from the present environment and affirmatively require enhancement of what we have now.

*Montana Constitutional Convention*, Vol. IV at 1205, March 1, 1972 (emphasis added),

**¶60. In further discussing the interrelationship between subsections (1) and (3) of Article IX, Delegate McNeil stated:**

The majority proposal before you now does recommend, as did Mr. Lindbergh, government monitoring. It goes further than that and directs the Legislature to provide remedies to prevent degradation. <u>This is anticipatory</u>.

*Montana Constitutional Convention*, Vol. IV at 126, March 1, 1972 (emphasis added).

<u>The proposal mandates the legislature to prevent degradation</u> and to prevent unreasonable depletion. Now, that includes private property.

*Montana Constitutional Convention*, Vol. V at 1221, March 1, 1972 (emphasis added).

**¶61.Delegates such as Mae Nan Robinson who agreed in substance with the preceding statements by Delegate McNeil suggested amendments but only for the purpose of assuring greater protection of the current environment. Delegate Robinson stated:**

> I contend that if you're really trying to protect the environment, you'd better have something whereby you can sue or seek injunctive relief before the environmental damage has been done; it does very little good to pay someone monetary damages because the air has been polluted or because the stream has been polluted if you can't change the condition of the environment once it has been destroyed.

*Montana Constitutional Convention*, Vol. V at 1230, March 1, 1972.

**¶62.In defending the section as proposed, proponents explained that:**

> The reason that the majority did not support a separate section saying "the right to sue", the paragraph 3 of our report states, "The Legislature is directed to provide adequate remedies for the protection of the environmental life support system from degradation and to provide adequate remedies to prevent unreasonable depletion of natural resources." Now, to those of us that studied what we were doing for a long time before we did it, we felt that this, in itself, is a lot stronger than, certainly, the proposal we're looking at right now [a proposed right to sue provision].

*Montana Constitutional Convention*, Vol. V at 1232-33, March 1, 1972.

**¶63.In concluding remarks in opposition to amending the committee majority's proposed Article IX, Section 1, Delegate McNeil gave the following explanation for the language being recommended:**

> We did not want the Supreme Court of this state or the Legislature to be able to say that the environment in Montana, as we know right now, can be degraded to a healthful environment. So our purpose in leaving that word out was to strengthen it. I would like also to remind the delegates that the Illinois provision does not contain subparagraph 3 of the majority proposal, [Article IX, Section 1(3)] which speaks

precisely to the point that concerned Jerry Cate so much, and that is there is no provision by which the Legislature can prevent–and this is anticipatory–can prevent unreasonable depletion of the natural resources. I submit if you will read that majority proposal again and again, you will find that it is the strongest of any constitution . . . .

*Montana Constitutional Convention*, Vol. V at 1243, March 1, 1972.

**¶64. Delegate Foster also gave the following defense of the language as originally proposed:**

I feel that if we, as a Constitutional Convention of Montana, use our line of defense on the environment on the basis of healthful, then we, in fact, might as well forget it, because what I'm concerned about in Montana is not a healthful environment. This country is going to have to address itself to the question of a healthful environment. What I'm concerned about is an environment that is better than healthful. If all we have is a survivable environment, then we've lost the battle. We have nothing left of importance. The federal government will see to it one way or another, if it's in its power, that we have an environment in which we can manage to crawl around or to survive or to in some way stay "alive". But the environment that I'm concerned about is that stage of quality of the environment which is above healthful; and if we put in the Constitution that the only line of defense is a healthful environment and that I have to show, in fact, that my health is being damaged in order to find some relief, then we've lost the battle; so I oppose this amendment.

*Montana Constitutional Convention*, Vol. V at 1243-44, March 1, 1972.

**¶65. In the end advocates for adding the descriptive language "clean and healthful" prevailed. However, it was not on the basis that they wanted less protection than articulated by Delegates McNeil and Foster, it was because they felt the additional language was necessary in order to assure the objectives articulated by Delegates McNeil and Foster.** *See* **Delegate Campbell cmts. (***Montana Constitutional Convention***, Vol. V at 1246, March 1, 1972). It was agreed by both sides of the debate that it was the convention's intention to adopt whatever the convention could agree was the stronger language.** *See* **Delegate McNeil cmts. (***Montana Constitutional Convention***, Vol. IV at 1209, March 1, 1972).**

¶66.Although Article IX, Section 1(1), (2), and (3) were all approved by the convention on March 1, 1972 (*Montana Constitutional Convention*, Vol. V at 1251, 1254-55, March 1, 1972) the right to a clean and healthful environment was not included in the Bill of Rights until six days later on March 7, 1972. On that date, Delegate Burkhart moved to add "the right to a clean and healthful environment" to the other inalienable rights listed in Article II, Section 3 of the proposed constitution. *Montana Constitutional Convention*, Vol. V at 1637, March 7, 1972. He explained his intention that it interrelate with those rights provided for and previously adopted in Article IX, Section 1. *Montana Constitutional Convention*, Vol. V at 1637, March 7, 1972. He also stated that it was his intention through the addition of this right to the Bill of Rights to give force to the language of the preamble to the constitution. *Montana Constitutional Convention*, Vol. V at 1637, March 7, 1972. Burkhart stated: "I think it's a beautiful statement, and it seems to me that what I am proposing here is in concert with what's proposed in that Preamble . . . ." *Montana Constitutional Convention*, Vol. V at 1638, March 7, 1972. Delegate Eck concurred that including the additional language in Article II, Section 3, was consistent with the intention of the Natural Resources Committee when it reported Article IX, Section 1. *Montana Constitutional Convention*, Vol. V at 1638, March 7, 1972. The right to a clean and healthy environment was, therefore, included as a fundamental right by a vote of 79 to 7. *Montana Constitutional Convention*, Vol. V at 1640, March 7, 1972. We have previously cited with approval the following language from 16 C.J.S. *Constitutional Laws* § 16 (1984):

> The prime effort or fundamental purpose, in construing a constitutional provision, is to ascertain and to give effect to the intent of the framers and of the people who adopted it. The court, therefore, should constantly keep in mind the object sought to be accomplished . . . and proper regard should be given to the evils, if any, sought to be prevented or remedied . . . .

*General Agric. Corp. v. Moore* (1975), 166 Mont. 510, 518, 534 P.2d 859, 864.

¶67.We conclude, based on the eloquent record of the Montana Constitutional Convention that to give effect to the rights guaranteed by Article II, Section 3 and Article IX, Section 1 of the Montana Constitution they must be read together and consideration given to all of the provisions of Article II, Section 1 as well as the preamble to the Montana Constitution. In doing so, we conclude that the delegates' intention was to provide language and protections which are both anticipatory and

preventative. The delegates did not intend to merely prohibit that degree of environmental degradation which can be conclusively linked to ill health or physical endangerment. Our constitution does not require that dead fish float on the surface of our state's rivers and streams before its farsighted environmental protections can be invoked. The delegates repeatedly emphasized that the rights provided for in subparagraph (1) of Article IX, Section 1 was linked to the legislature's obligation in subparagraph (3) to provide adequate remedies for degradation of the environmental life support system and to prevent unreasonable degradation of natural resources.

¶68. We conclude, therefore, that the District Court erred when it held that Montana's constitutional right to a clean and healthy environment was not implicated, absent a demonstration that public health is threatened or that current water quality standards are affected to such an extent that a significant impact has been had on either the Landers Fork or Blackfoot River.

¶69. We conclude that the constitutional right to a clean and healthy environment and to be free from unreasonable degradation of that environment is implicated based on the Plaintiffs' demonstration that the pumping tests proposed by SPJV would have added a known carcinogen such as arsenic to the environment in concentrations greater than the concentrations present in the receiving water and that the DEQ or its predecessor after studying the issue and conducting hearings has concluded that discharges containing carcinogenic parameters greater than the concentrations of those parameters in the receiving water has a significant impact which requires review pursuant to Montana's policy of nondegradation set forth at § 75-5-303, MCA. The fact that DEQ has a rule consistent with § 75-5-317(2)(j), MCA (1995), is of no consequence. As we have previously held in *Wadsworth*, the constitution applies to agency rules as well as to statutes.

¶70. We conclude that for purposes of the facts presented in this case, § 75-5-303, MCA is a reasonable legislative implementation of the mandate provided for in Article IX, Section 1 and that to the extent § 75-5-317(2)(j), MCA (1995) arbitrarily excludes certain "activities" from nondegradation review without regard to the nature or volume of the substances being discharged, it violates those environmental rights guaranteed by Article II, Section 3 and Article IX, Section 1 of the Montana Constitution. Our holding is limited to § 75-5-317(2)(j), MCA (1995), as applied to the facts in this case. We have not been asked to and do not hold that this section facially implicates constitutional rights.

¶71.Based on these holdings, we reverse the judgment of the District Court and remand to the District Court for strict scrutiny of the statutory provision in question, and in particular for a determination of whether there is a compelling state interest for the enactment of that statute based on the criteria we articulated in *State v. Wadsworth*.

¶72.The judgment of the District Court is reversed and this case is remanded for further proceedings consistent with this opinion.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

/S/ JIM REGNIER

Justice W. William Leaphart, specially concurring.

¶73.I concur in the result reached by the Court and specifically with the conclusion that the right to a clean and healthful environment is a fundamental right guaranteed by the Declaration of Rights found at Article II, Section 3 of the Montana Constitution. Having so concluded, the Court goes on to declare that "state or private action which implicates either [Article II, Section 3 or Article IX, Section 1 of the Montana Constitution], must be scrutinized consistently. Therefore, we will apply strict scrutiny to state or private action which implicates either constitutional provision." I agree that state action implicating the rights guaranteed by Article II, Section 3 or Article IX, Section 1, must be subject to strict scrutiny. Although Article IX, Section 1, clearly imposes an obligation on private entities, as well as the state, to maintain and improve a clean and healthy environment, I would not, in the context of this appeal, address the question of private action. In resolving this appeal, we are

not addressing private action. Rather, we are addressing state action; that is, the constitutionality of a state statute. The conclusion that we will apply strict scrutiny analysis to private action is dicta which, I submit, may well prove unworkable in the future. As we state in this opinion, strict scrutiny analysis requires that the state demonstrate a compelling state interest and that its action is both closely tailored to effectuate that interest and the least onerous path that can be taken to achieve the State's objective. I am not clear as to how, or whether, private action lends itself to a "compelling state interest" analysis. That is a question that I think would be better left to another day.

¶74.Finally, the Court concludes that

> to the extent § 75-5-317(2)(j), MCA (1995), arbitrarily excludes certain "activities" from nondegradation review without regard to the nature or volume of the substances being discharged, it violates those environmental rights guaranteed by Article II, Section 3 and Article IX, Section 1 of the Montana Constitution. Our holding is limited to § 75-5-317(2)(j), MCA (1995), as applied to the facts of this case. We have not been asked to and do not hold that this section facially implicates constitutional rights.

¶75.I do not see how the Court can logically avoid declaring that the statute is unconstitutional on its face. The constitutional infirmity of § 75-5-317(2)(j), MCA (1995), is not limited to the facts in the present case but inheres in the statute's creation of a blanket exception. It creates a blanket exception to the requirements of nondegradation review for discharges from water well or monitoring well tests without regard to the harm caused by those tests or the degrading effect that the discharges have on the surrounding or recipient environment. The fact that there may be water discharges from well tests, say for agricultural purposes, that do not in fact create harm to the environment, does not alter the fact that such discharges are exempted from nondegradation review and that such review is the tool by which the State implements and enforces the constitutional right to a clean and healthy environment. The facial unconstitutionality of § 75-5-317(2)(j), MCA (1995), lies in its exemption of particular water discharges from nondegradation review without consideration of the nature and volume of substances in the water that is discharged. The possibility that some water discharges will not harm the environment does not

justify their exemption from careful review by the State to protect Montana's fundamental rights to a clean and healthy environment and to be free from unreasonable degradation of that environment. The whole purpose of the nondegradation review is to determine, in advance, whether a water discharge will be harmful and, if so, is the harm justified and can it be minimized. *See* § 75-5-303, MCA. In excluding water discharges from well tests from review, the statute makes it impossible for the State to "prevent unreasonable depletion and degradation of natural resources" as required by Article IX, Section 1(3), of the Montana Constitution. Art. IX, Sec. 1(3), Mont. Const.

/S/ W. WILLIAM LEAPHART

Chief Justice J. A. Turnage joins in the foregoing specially concurring opinion.

/S/ J. A. TURNAGE

Justice Karla M. Gray, specially concurring.

76.¶ Except for the "private action" subject addressed in Justice Leaphart's special concurrence, I concur in the Court's opinion in all regards. I join Justice Leaphart's opinion insofar as it relates to the propriety of addressing the "private action" question in this case.

/S/ KARLA M. GRAY