JUSTICE NELSON
delivered the Opinion of the Court.
¶1 Cape-France Enterprises brought this action to rescind an agreement between the parties for the sale of a tract of land in Bozeman, Montana. On cross-motions for summary judgment the District Court granted summary judgment in favor of Cape-France. The Estate of Lola Peed and Marthe Moore appeal from the District Court’s order granting summary judgment in favor of Cape-France. We affirm.
¶2 The dispositive issue on appeal is restated as follows:
¶3 Whether the District Court correctly concluded that the parties’ buy-sell agreement was unenforceable on the grounds of impossibility or impracticability and correctly refused to order specific performance.
FACTUAL AND PROCEDURAL HISTORY
¶4 Cape-France Enterprises (Cape-France), is the owner of a tract of real property in Bozeman, Montana. Lola Peed[1] and her granddaughter Marthe Moore (Peed and Moore) wished to buy a portion of that tract of land in order to build a motel or hotel. The two parties worked through a real-estate agent in the arrangement of this transaction.
¶5 Cape-France entered into a buy-sell agreement in 1994 with Peed and Moore for the purchase of a five acre portion of their land that was to be surveyed. The land had not been subdivided at the time of the agreement and needed to be subdivided and re-zoned in order for the sale to be completed. Closing was supposed to take place in September of 1994 but a plat creating the tract at issue was never recorded and the subdivision and closing never took place.
¶6 The parties attempted to accomplish subdivision of the property but several obstacles presented themselves. First, difficulties were encountered with the state and local agencies responsible for approving the subdivision. According to the depositions, application files were lost by the state more than once, which caused delays. Second, the parties encountered difficulty in obtaining water, which ultimately needed to be procured in order for subdivision to be *515 approved. Water was not available to the land at the time the agreement was made. According to the agreement, it was the responsibility of Peed and Moore, as buyers, to bring water to the property. City water was not available, so presumably, a well would have to be drilled for that water.
¶7 To complicate matters further, a pollution plume was spreading through the groundwater in Bozeman in the area of the tract in question. Sometime during this process, it was discovered that the plume was closer to the land than had been expected. It is not clear where the pollution plume had moved, but state and local officials feared that it may have spread, possibly underneath the tract.
¶8 The potential presence of the pollution plume presented an obstacle to the parties’ ability to subdivide the property. Ultimately, the Department of Environmental Quality, Water Quality Division (DEQ) warned Cape-France that the subdivision would not be approved unless a well was first drilled and tested. DEQ also warned that the pollution plume may have advanced under Cape-France’s property and if the testing of the well water showed pollution in the water, the necessary treatment of this water would be extensive. Further, DEQ warned that if the drilling or pumping of the water caused expansion of the pollution, Cape-France, as the owner of the property, would be held liable for the clean-up costs. This warning took place after the subdivision process was commenced, making it clear to Cape-France that the completion of water drilling and testing was required before subdivision would be approved. According to the record, drilling and testing still have not been completed.
¶9 The warning came in December of 1995, when Cape-France received a notice from DEQ, which informed it that the property was located within a groundwater contamination site:
This letter is to inform you that perchlor[o]ethylene (PCE) has been detected in a well near the north boundary of old Highway 10 .... The contamination appears to be extending north but the extent of the contamination is unknown. You and your client need to be aware of the consequences resulting from drilling wells in the vicinity of the plume. Water supply wells drilled in your proposed subdivision may tap contaminated groundwater or may become contaminated over time with pumping. If contaminated groundwater is encountered then advanced treatment of the water will be required. The legal owners of the subdivision lots will be liable under the Water Quality Act or other environmental laws (state or federal) if pollution results from improper well construction or if contaminated groundwater is pumped into a clean area.
¶10 Although the parties appear to have been aware of the existence of a pollution plume in Bozeman, presumably originating from a dry cleaner in the area, they believed the property at issue to be unaffected until receiving this notice.
¶11 A second letter was sent by DEQ to Cape-France, informing the partners that before subdivision could be approved:
*516 A well must be drilled and pump tested per WQB 3 3.2.4. Also, the well must be sampled for VOCs in accordance with EPA method 524.2. The well that is drilled and tested should be the proposed well that is closest to the Bozeman Solvent Site.
¶12 The District Court ruled, on cross-motions for summaryjudgment, that the agreement could be rescinded on the basis of mutual mistake of fact, impossibility and impracticability of performance and that specific performance would not be granted.
STANDARD OF REVIEW
¶13 Our standard of review on appeal from summary judgment rulings is de novo. See Motarie v. N. Mont. Joint Refuse Disposal (1995), 274 Mont. 239, 242, 907 P.2d 154, 156, Mead v. M.S.B., Inc. (1994), 264 Mont. 465, 470, 872 P.2d 782, 785. When we review a district court’s grant of summary judgment, we apply the same evaluation as the district court based on Rule 56, M.R.Civ.P., Bruner v. Yellowstone County (1995), 272 Mont. 261, 264, 900 P.2d 901, 903. The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Bruner, 272 Mont. at 264, 900 P.2d at 903.
¶14 Ordinarily, such a review requires that we first determine whether the moving party met its burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. Jarrett v. Valley Park, Inc. (1996), 277 Mont. 333, 338, 922 P.2d 485, 487. In this case, however, the facts are undisputed. Through their cross-motions for summary judgment, each party asserted entitlement to judgment as a matter of law. Therefore, our review is confined to the District Court’s conclusions of law. We review a district court’s conclusions of law to determine whether the court’s interpretation of the law is correct. Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.
DISCUSSION
¶15 Whether the District Court correctly concluded that the parties’ buy-sell agreement was unenforceable on the grounds of impossibility or impracticability, and correctly refused to order specific performance.
¶16 Cape-France argues, and the District Court determined, that the contract should be rescinded because the spread of the pollution and the potential liability involved with drilling a well made subdivision of the property impossible or impracticable.
¶17 This Court has observed that, “impossibility of performance is a strict standard that can only be maintained where the circumstances truly dictate impossibility. The general rule is that, where a party to a contract obligates himself to a legal and possible performance, he must perform in accordance with the contract terms.” Barrett v. *517 Ballard (1980), 191 Mont. 39, 44, 622 P.2d 180, 184 (citation omitted). See also, 360 Ranch Corp. v. R&D Holding (1996), 278 Mont. 487, 926 P.2d 260. However, “[^Impossibility encompasses not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.” Smith v. Zepp (1977), 173 Mont. 358, 364, 567 P.2d 923, 927, quoting the Restatement of Contracts, Section 454.
¶18 The Montana Code allows for rescission of a contract based on impossibility, under § 28-2-603, MCA, providing:
Where a contract has but a single object and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void.
¶19 Rescission of a contract under the doctrine of impossibility or impracticability, while a strict standard, is not limited to literal impossibility, but also encompasses impracticability. As observed by the Fourth Circuit Court of Appeals:
[MJodern authorities [have] abandoned any absolute definition of impossibility and, following the example of the Uniform Commercial Code, have adopted impracticability or commercial impracticability as synonymous with impossibility in the application of the doctrine of impossibility of performance as an excuse for breach of contract. Opera Co. of Boston v. Wolf Trap Foundation (4th Cir. 1987), 817 F.2d 1094, pp. 1098.
¶20 Commentators in this area of contracts have also noted the broadening scope of the doctrine of impossibility or impracticability. Corbin observes that the modern doctrine of impossibility of performance is one, “invented by the court in order to supplement the defects of the actual contract” in the interest of reason, justice and fairness. 6 Corbin, Contracts § 1331, p. 360. In addition, Williston views the enlargement of the doctrine as making it “essentially an equitable defense, [which could] ... be asserted in an action at law” 18 Williston, Contracts, § 1931, p. 6.
¶21 The Restatement Second of Contracts explains that:
Even where the obligor has not limited his obligation by agreement, a court may grant him relief. An extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance. In such a case the court must determine whether justice requires a departure from the general rule that the obligor bear the risk that the contract may become more burdensome or less desirable.
¶22 The doctrine of impossibility found in the Restatement is relied upon by various courts. The Michigan Court of Appeals in Bissell v. L.W. Edison Company (1967), 156 N.W.2d 623, 626, relying on the Restatement of Contracts, Section 457, concluded that the doctrine of impossibility is a valid defense not only when performance is impossible, but also when supervening circumstances make performance impracticable. Section 457 of the Restatement of *518 Contracts, now Section 261 of the Restatement (Second) of Contracts (1981) provides:
Discharge by Supervening Impracticability Where, after a contract is made, a party’s performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary. Restatement Second of Contracts, § 261, p. 313.
The court observed that Section 261 defines impossibility to include, “not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury and loss involved.’’Bissell, 156 N.W.2d at 626.
¶23 Courts may determine that an act is “impossible” in legal contemplation when it is not practicable. Such an act is impracticable when it can only be done at an excessive, unreasonable and unbargained-for cost. While the doctrine of impossibility or impracticability is not set in stone, it is applied by courts where, aside from the object of the contract being unlawful, the public policy underlying the strict enforcement of contracts is outweighed by the senselessness of requiring performance.
¶24 The doctrine is applicable under the facts in the case at bar. As the District Court noted in its Memorandum and Order:
[I]t is undisputed that after the agreement was executed, the state and local regulatory authorities required the completion of water drilling and testing. The parties discussed the situation. Cape France was unwilling to assume large risks related to this new, unknown and unexpected situation. Peed-Moore was unwilling to provide Cape-France with an indemnity agreement and bond which was satisfactory to Cape-France.
Contamination, if it exists or occurs by reason of well-drilling, could expose Cape-France as landowners to financial liability of an unquantifiable nature. The DEQ’s letters dated December 21, 1995 and January 12, 1996, contained information that the subdivision would not be approved unless a satisfactory well was drilled, and noted that the proposed subdivision could be in an area of groundwater contamination.
¶25 Peed and Moore argue that the contract should not be rescinded on the basis of impossibility because it is not impossible to drill the well. They point to the letters as evidence that the well could be drilled and that there is no proof that there would be actual groundwater contamination where they would drill. However, Peed and Moore do not argue, and cannot argue, that there is no groundwater contamination, nor can they say that there will not be any in the future. Unfortunately, the only way to determine whether there is and, if so, the extent of groundwater contamination is to drill a well. And that is the precise activity that may exacerbate the contamination problem, to both party’s substantial and unbargained-for economic detriment. Indeed, it is clear that Peed and Moore are unwilling or *519 unable to share in these economic risks.
¶26 Moreover, as already noted, while impossibility or impracticability is a high standard, the application of this doctrine is not limited to cases of literal impossibility. Here, the potential for substantial and unbargained-for damage involved in performing the contract is not only of an economic nature. Just as importantly, environmental degradation with consequences extending well beyond the parties’ land sale is also a real possibility.
¶27 It is undisputed that the water system required for subdivision may tap into contaminated groundwater and that pumping this water could spread the pollution plume further into other, uncontaminated aquifers.
¶28 Perchloroethylene is a dangerous substance. Reports from the United States Environmental Protection agency link contact with PCE to human health hazards as well as with other adverse environmental effects. Health risks to humans may include developmental toxicity, cancer, liver and kidney dysfunction, as well as short and long term effects on the nervous system. PCE is also toxic to aquatic life such as fish and algae. See, Cleaner Technologies Substitutes Assessment: Professional Fabricare Processes, U.S. Environmental Protection Agency, Chapter Five, June 1998, EPA Doc 744-B-98-001.
¶29 We agree with the District Court’s assessment. The record reflects that in order for Cape-France to proceed further with the subdivision and zoning issues it would be forced to expose itself, not only to substantial and unbargained-for economic risks but, as well, the public would be exposed to potential health risks and possible environmental degradation.
¶30 Peed and Moore, nonetheless, argue that potential liability is not a reason to rescind a contract. They argue that the courts should force the parties to go through with the contract. In the context of this case, however, this argument ignores an important-and, in fact, a decisive-point.
¶31 Montana’s Constitution, Article II, Section 3, guarantees all persons in this state the right to a clean and healthful environment. This guarantee is a fundamental right that may be infringed only by demonstrating a compelling state interest. MEIC v. Department of Environmental Quality, 1999 MT 248, ¶ 63, 296 Mont. 207, ¶ 63, 988 P.2d 1236, ¶ 63, (recognizing that the right to a clean and healthful environment is a fundamental right because it is guaranteed by the Declaration of Rights in Montana’s Constitution.) We have stated that a compelling state interest is, “at a minimum, some interest ‘of the highest order and ... not otherwise served’ ” or “ ‘the gravest abuseD, endangering [a] paramount [government] interest[]’ .” Armstrong v. State, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, at fn 6.
¶32 Moreover, interrelated with and interdependent upon Montanans’ fundamental Article II, Section 3 right to a clean and healthful environment is the mandate provided in Article IX, Section 1, of our Constitution. This provision provides, in pertinent part, that “the State and each person shall maintain and improve a clean and healthful *520 environment in Montana for present and future generations....” While MEIC involved state action, we, nonetheless, recognized that the text of Article IX, Section 1 applies the protections and mandates of this provision to private action-and thus to private parties-as well. See, MEIC, ¶ 64.
¶33 In light of these two provisions of Montana’s Constitution, it would be unlawful for Cape-France, a private business entity, to drill a well on its property in the face of substantial evidence that doing so may cause significant degradation of uncontaminated aquifers and pose serious public health risks. As already noted, a contract may be rescinded where the object of the contract is unlawful. Section 28-2-603, MCA.
¶34 Moreover, for a court to mandate specific performance of the contract at issue on the record here, would not only be to require a private party to violate the Constitution-a remedy that no court can provide-but, as well, would involve the state itself in violating the public’s Article II, Section 3 fundamental rights to a clean and healthful environment, and in failing to maintain and improve a clean and heálthful environment as required by Article IX, Section 1.
¶35 Furthermore, the law’s interest in enforcing a contract for a land sale between two private parties is hardly the sort of compelling state interest under the criteria that we discussed in Armstrong that would justify this, or any court, ordering specific performance of the parties’ agreement given the fundamental constitutional rights at issue and the substantial risk of violating those rights as demonstrated by the record here.
¶36 As already noted, State and local officials required the drilling of a water well on Cape-France property'in order for the subdivision to be approved, but warned that if the required well tapped into contaminated water and spread that contamination to the Cape-France property, adjacent property or other aquifers, Cape-France would be liable for the contamination and subsequent cleanup under state and federal laws.
¶37 Causing a party to go forward with the performance of a contract where there is a very real possibility of substantial environmental degradation and resultant financial liability for clean up is not in the public interest; is not in the interests of the contracting parties; and is, most importantly, not in accord with the guarantees and mandates of Montana’s Constitution, Article II, Section 3 and Article IX, Section 1.
¶38 Affirmed.
JUSTICES COTTER, REGNIER and TRIEWEILER concur.

 Peed is now deceased and being represented by her estate.