DA 13-0068

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 267

CNJ DISTRIBUTING CORP. dba
FAIRVIEW ANGUS RANCH,

        Plaintiff and Appellant,

  v.

D & F FARMS, INC.,

        Defendant and Appellee,

  v.

CIRCLE S SEEDS OF MONTANA,
INC.,

        Third Party Defendant.

APPEAL FROM:    District Court of the Sixth Judicial District,
                      In and For the County of Sweet Grass, Cause No. DV 2010-10
                      Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

        For Plaintiff and Appellant:

                Rodd A. Hamman, Calton Hamman & Wolff, P.C.; Billings, Montana

        For Appellee:

                Edward J. Guza, Guza, Williams & Nesbitt; Bozeman, Montana

                                    Submitted on Briefs:  July 24, 2013
                                            Decided:  September 17, 2013

Filed:

                                      _____
                                              Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1    CNJ Distributing Corp. (CNJ) appeals from the Order of the Sixth Judicial District, Sweet Grass County, denying and dismissing with prejudice CNJ's breach of contract claim against D&F Farms, Inc. (D&F).

## ISSUES

¶2    We restate the issues on appeal as follows:

¶3    *Did the District Court err in finding D&F did not materially breach the contract by failing to object to rocky field conditions or by failing to achieve consistent depth of seed placement?*

¶4    *Did D&F's failure to get the seed to the proper depth prevent CNJ from harvesting the crop during harvest season and proximately cause CNJ's damages?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶5    This controversy arose after CNJ hired D&F as a custom seeder to seed a barley crop grown under contract with Circle S Seeds of Montana, Inc. (Circle S).  CNJ sued D&F for breach of contract, alleging the crop did not ripen and could not be harvested on time because of improper seed placement.  D&F sued Circle S alleging failure to instruct.  After a bench trial, Circle S settled with D&F.  The District Court, in an Order filed December 20, 2012, denied and dismissed with prejudice CNJ's breach of contract claim.  CNJ appealed.

¶6    *The uncontested findings of fact are as follows:*

¶7    CNJ owns and operates the Fairview Ranch in Sweet Grass County, Montana. George Frank (Frank) is the owner and President of CNJ.  CNJ purchased the Fairview

2

Ranch in 1984. Since that time, the Fairview Ranch has been operated as a registered Angus ranch with irrigated hay and pasture. CNJ has hired a full-time ranch manager to run the Fairview Ranch. Kenny Lee (Lee) started as manager of the Fairview Ranch on May 1, 2009.

¶8 D&F is a Montana corporation doing business out of Manhattan, Montana. Matt Flikkema (Flikkema) owns D&F. D&F is a "custom seeder." This means landowners, like CNJ, hire D&F to plant crops. D&F supplies the seeding equipment, in this case a John Deere 1890 pulled by a tractor, and provides qualified individuals to operate the equipment. Casey Hamilton (Hamilton), an experienced and qualified operator, works for Flikkema doing the seeding.

¶9 Circle S is a Montana corporation doing business out of Three Forks, Montana. Circle S is a supplier of seeds, and per the agreement entered into with CNJ, a beneficiary to the crop that was to be produced on CNJ land in fall 2009. Steve McDonnell (McDonnell) is one of the owners of Circle S. Don Heck (Heck) is an agronomist/Certified Crop Advisor for Circle S and personally visited and inspected the field at issue at least six times.

¶10 In the fall of 2008, Circle S contracted with Montsago to produce a barley crop known as BG 46e for food purposes. WestBred, LLC of Bozeman, Montana developed BG 46e. Dr. Dan Biggerstaff (Biggerstaff), one of the developers of BG 46e, is an expert on BG 46e.

¶11 Pivot 2 is a "very rocky" section of field comprising 550 net irrigated acres, located on the Fairview Ranch. In the fall of 2008, CNJ hired Dwight Dyk (Dyk) of Dyk

3

Enterprises, Inc., to chem fallow Pivot 2 to kill the existing vegetation so CNJ could reseed the next spring.

¶12 McDonnell knew that CNJ was going to reseed Pivot 2. McDonnell telephoned Frank in the winter of 2009 about contracting to grow BG 46e in that field and set up a meeting to discuss seeding options. Before meeting with Frank, McDonnell called Flikkema about seeding BG 46e at the Fairview Ranch in a custom no-till seed job to obtain a price quote. McDonnell told Flikkema the fields at Fairview Ranch had a lot of rocks. Flikkema did not express any concerns and gave McDonnell a price. McDonnell did the same with other input providers and put together a written proposal with a cost and income projections. McDonnell faxed the proposal to Frank on March 10, 2009.

¶13 D&F and Circle S had formed a relationship over the years where Circle S would recommend D&F to its customers for custom seeding and then contact D&F to discuss details of the job. Details discussed generally included how the land was to be seeded (till or no-till), what was being seeded, and when the land was to be seeded. Typically, Circle S would come out to the property being seeded on the day of seeding to ensure the instructions were conveyed to Flikkema and would stay around for a couple of passes to make sure there were no problems. The land owner would typically pay D&F directly.

¶14 On March 11, 2009, McDonnell and Heck traveled to Billings and met with Frank. Frank agreed to the proposal, knowing no-till seeding would be used. McDonnell and Frank executed the Grain Production Agreement. Pivot 2 would have been seeded with alfalfa grass had McDonnell and Frank not agreed otherwise.

4

¶15     As Biggerstaff explained in his Deposition, BG 46e is a type of waxy barley characterized by a shrunken endosperm. The endosperm is the starch portion of the seed which provides the energy for the seed to germinate. When the plant emerges from the soil, sunlight provides the energy needed for it to continue growing. Because the endosperm is small, if the seed is planted too deep, it will not have enough energy to reach the surface and will die. Also, if the soil is too cold it will hamper the seed's ability to germinate and emerge. BG 46e should be planted from ¾ to 1½ inches deep.

¶16     McDonnell concluded no-till seeding, the predominant seeding method in Montana, was the best option for BG 46e because a tilled field would be too soft to maintain the required planting depth. There had not been no-till seeding on the Fairview before 2009. The decision to use no-till was made by McDonnell and Frank, not D&F. McDonnell and Frank decided seeding would occur on May 20, 2009.

¶17     Because of the length of time it takes to till a field as rocky and hard as Pivot 2, testimony revealed that by May 20, no-till seeding was the only option left to plant the crop in the spring of 2009.

¶18     Seeding occurred on May 20, 2009. As was their custom, Flikkema and McDonnell met at the field on the day work was to occur.

¶19     Before Flikkema left, he walked about 50 feet out into the field and Lee pointed out the large amount of rocks in the field. Because of the rocky ground, Lee asked McDonnell whether the ground needed to be torn up first or no-till. McDonnell stated that the drill was capable of planting the crop. McDonnell told Lee that he did not feel the rocks would pose a

5

problem for planting. McDonnell did not express any problems with the field conditions to Flikkema.

¶20     McDonnell instructed D&F to plant the seeds at a depth of one and a half inches. Hamilton and Flikkema set the depth setting on the 1890 to one and a half inches and set the down pressure to "medium green."

¶21     Immediately, when Hamilton began planting, he heard the 1890's disks chattering as they rolled over rock in the field. The chattering of the disks means that the 1890 does not have enough pressure to keep contact with the soil and/or is driving too fast. He increased the down pressure from green to orange. He also reduced his speed to make the best possible contact with the ground, to about two to three miles per hour.

¶22     As he was seeding, Hamilton made several visual checks for seed placement, which included taking a pocketknife and digging to uncover seeds. The seeds that made contact with solid rock, or were planted after the drill rolled off the edge of a rock, or were planted on top of buried rocks, would be anywhere from the surface to one inch deep. When the drill pulled out of the ground for any reason, large amounts of seed would dump out.

¶23     Either the first day or the morning of the second day of seeding, Hamilton contacted Flikkema. He reported to Flikkema the field condition and the changes he made to the drill and his speed. Flikkema told Hamilton he had done everything that Flikkema would have done under the conditions. Flikkema told Hamilton to tell Lee what he was experiencing. Hamilton told Lee over supper that "the field conditions were bad." Lee did not inspect the field or take any other steps after Hamilton's report.

6

¶24    *The following facts are necessary context for the current action:*

¶25    McDonnell returned to the Fairview to inspect the crop a few weeks after seeding and noted a large amount of seed on the ground. Lee characterized the amount of seed on the ground as "tremendous." McDonnell called Flikkema and told him the seeding job was bad and he needed to get in touch with CNJ.

¶26    On July 16, 2009, Dyk returned to spray the field for weeds. He stated about 50 percent of the crop had emerged properly and was approximately 10 to 12 inches tall. Other plants were substantially behind and were about six inches tall, with other areas where seeds were lying on the ground. He believed this disparity was due to improper seed placement; but had never seeded a waxy barley, nor operated a John Deere 1890.

¶27    Heck, who is a certified crop specialist, asserted the amount of seeds on the surface was comparable to other similar rocky fields.

¶28    Circle S planned to complete harvest by mid-September. However, because the less mature plants remained green, the crop could not be harvested on schedule. By October, the plants still had not been harvested; and a heavy snow destroyed the crop. As a result, CNJ had to swath and bail the barley for cattle feed and made no profit on the crop.

¶29    CNJ sued D & F for breach of contract alleging the seeding caused the crop to fail.

¶30    *The District Court found as follows:*

¶31    The District Court found it may have been prudent to till Pivot 2 before planting; and that the decision to plant without tilling was made by CNJ and Circle S.

¶32    The District Court found:

It is not surprising that seeds were found on the ground. Anytime the disk rolled over a rock, and there were many in this field, it was off the ground for a short time and seeds will scatter 1 to 4 inches. Further, anytime the operator turns or takes the wheels off the ground the whole content of the seed in the hoses is emptied.

¶33 The District Court found no adjustments beyond those Hamilton made were necessary. The problem, it concluded, was not the seeder but the condition of the field. The court noted that the same drill was used to plant some grass seed for CNJ at a different location and that job was satisfactory. It observed that it would be unusual that the drill only malfunctioned on one job unless other factors were at issue.

## STANDARD OF REVIEW

¶34 We review the District Court's findings of fact to determine if they are clearly erroneous and its conclusions of law to determine whether they are correct. *Cut Bank School Dist. No. 15 v. Rummel*, 2002 MT 248, ¶ 5, 312 Mont. 143, 58 P.3d 159 (citing *Norwood v. Service Distributing Inc.*, 2000 MT 4, ¶ 21, 297 Mont. 473, 994 P.2d 25). A finding is clearly erroneous "if it is not supported by substantial credible evidence, if the court misapprehended the effect of the evidence, or if a review of the evidence leaves this Court with a definite and firm conviction that a mistake has been made." *Puccinelli v. Puccinelli*, 2012 MT 46, ¶ 13, 364 Mont. 235, 272 P.3d 117.

## DISCUSSION

¶35 Ultimately, this dispute centers on whose job it was to foresee the effect of the rocky field on seeding. The subsidiary issue is whether the seeding caused the crop to fail.

8

Because we conclude the District Court's determination that D&F did not materially breach the contract with CNJ was not clearly erroneous, we do not reach the second issue.

¶36    *ISSUE 1. Did the District Court err in finding D&F did not breach the contract by failing to object to rocky field conditions or by failing to achieve uniform depth of seed placement?*

¶37    CNJ claims that D&F breached the seeding contract. The question of whether a party materially breached a contract is a question of fact and we review the district court's findings to determine whether they are clearly erroneous. *Eschenbacher v. Anderson*, 2001 MT 206, ¶ 22, 306 Mont. 321, 34 P.3d 87. CNJ carried the burden of proving that D&F breached the contract. *See Lindeman v. Pinson*, 171 P. 271, 272 (1918) (overruled on other grounds) (burden of proof in breach of contract claim rests with plaintiff).

¶38    *a. Failing to object to rocky field conditions.*

¶39    CNJ states: "D&F had the opportunity to inspect the field both before and during seeding and if they [*sic*] concluded they [*sic*] could not do the job, CNJ could have canceled the barley crop and reseeded to grass/alfalfa. But D&F accepted the job with existing field conditions." D&F counters that "CNJ's suggestion that on May 20, D&F should have simply walked away from the job because of the conditions on the land is ridiculous." D&F points out that to do so would have placed D&F in breach of both its contracts with CNJ and with Circle S, arguing it could not perform a job it could, and ultimately did, perform.

¶40    The District Court concluded that the contract between D&F and CNJ consisted of an oral agreement negotiated by Circle S. The District Court explained the contractual oral

9

agreement provided that D&F would fertilize and seed BG 46e in approximately 570 acres. The court concluded: "There was no evidence to suggest…that D&F had any additional requirements such as choosing the crop, deciding when the crop was to be planted, preparing the field, deciding when watering was to occur, or guaranteeing the crop's success in any manner."

¶41 The District Court further concluded that Hamilton did his work in a workmanlike manner. He made the necessary adjustments to get seeds into the ground, under the conditions. In evaluating Hamilton's performance, the District Court relied on Hamilton and Flikkema's testimony that no additional adjustments to the 1890 would have made any difference. "It is the province of the district court to determine the credibility of the witnesses and the weight assigned to their respective testimony." *Hood v. Hood*, 2012 MT 158, ¶ 42, 365 Mont. 442, 282 P.3d 671.

¶42 The District Court also pointed out that D&F ensured Lee was aware of the conditions Hamilton was encountering. The District Court explained, "it was not the responsibility of D&F to prepare the field for seeding or even evaluate whether the field needed any preparation—*if* that would have made any difference." (Emphasis original.) It is undisputed that "[b]ecause of the length of time it takes to till a field as rocky and hard as Pivot 2, by May 20, testimony revealed that no-till was the only option left to plant the crop in the spring of 2009."

¶43 We conclude that the District Court did not clearly err when it determined that D&F did not materially breach the contract by failing to object to the field conditions upon

10

inspection. McDonnell and Frank made the decision to use no-till seeding, not D&F. Field preparation was Circle S and CNJ's responsibility. D&F did not see the field until the day work was to begin. McDonnell stated he had no doubt the field could be adequately seeded by the 1890 despite the rocky conditions. The District Court determined, on the basis of testimony, that Hamilton made all necessary adjustments for the conditions. On these facts, the District Court's determination that no material breach occurred was not clearly erroneous and substantial evidence supported the court's finding.

¶44    *b. Failing to achieve consistent depth of seed placement.*

¶45    "With respect to oral contracts, it is the duty of the trial court to determine the meanings to be given words and the intention of the parties." Richard A. Lord, Williston on Contracts vol. 11, § 30:8, 128, 130 (4th ed., West 2011). A court may not re-write the terms of a contract, but must enforce the contract as the parties intended. *Stutzman v. Safeco Ins. Co. of America*, 284 Mont. 372, 376, 945 P.2d 32, 34 (1997). A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. Section 28-3-201, MCA. Stipulations which are necessary to make a contract reasonable or conformable to usage are implied in respect to matters concerning which the contract manifests no contrary intention. Section 28-3-701, MCA. CNJ argues that having accepted the contract, D&F was obligated to seed the crop to a depth of one and one half inches because that depth was a term of the contract.

11

¶46 The District Court concluded, based on Hamilton and Flikkema's testimony, that "it is simply impossible for the 1890 to plant a seed in an immovable rock or deeper than that which an immovable rock allowed under the surface." CNJ attempts to paint this conclusion as the District Court accepting an "impossibility" defense to performance and alleges it is an error of law. D&F argues "nowhere in the court's Findings or Conclusions was there any mention of 'impossibility.'"

¶47 We agree with the District Court that D&F's failure to achieve consistent depth of seed placement did not constitute a material breach of the contract. We also are not convinced that the District Court accepted an "impossibility" defense, or that such a defense would be applicable at all under these facts. The District Court did not clearly err when it found that failure to achieve consistent seed placement did not constitute a material breach under these conditions.

¶48 It is unclear at what point CNJ alleges 1 ½ inch depth became a term of the contract. However, McDonnell instructed Flikkema to plant the seeds to one and a half inches. Per McDonnell's instructions on May 20, D&F set the drill to one and a half inch depth.

¶49 As the District Court noted, Biggerstaff testified at his deposition that "uneven depth of seed is almost a given in any planting operation unless you had an absolutely perfect seedbed." He also testified that "[h]aving seed deeper than 1 inch and seed on the surface does not preclude what I would call an acceptable seeding job." The WestBred planting guide suggested planting to between ¾ and 1 ½ inches deep, suggesting that some variability was acceptable. CNJ even admitted in its brief: "No one expected the seed placement to be

12

perfect." The District Court found, based on substantial credible evidence that it was not surprising seeds were found on the ground given the amount of rocks in the field.

¶50     The District Court did not clearly err when it determined that failing to achieve a consistent depth of seed placement under these conditions did not constitute a material breach. The evidence before the District Court indicated that having seed on the ground and inconsistent placement were foreseeable consequences of the field conditions and not, as CNJ argued, indicative of a legally-deficient performance. All facts and testimony pointed to the fact that variation in seed placement was consistent with what the parties should reasonably have expected and did expect. The District Court observed that the WestBred planting guide suggested that a depth of as little as ¾ inch remained adequate and within specifications for proper planting. Thus, substantial credible evidence supported the District Court's determination that D&F met its obligations under the parties' agreement.

¶51     Further, the District Court's statement that "it is simply impossible for the 1890 to plant a seed in an immovable rock" did not signal the court accepting an impossibility defense. In *Smith v. Zepp*, this Court observed that "[t]he general rule is that, where a party to a contract obligates himself to a legal and possible performance, he must perform in accordance with the contract terms." *Smith v. Zepp*, 173 Mont. 358, 364, 567 P.2d 923, 927 (1977) (superseded on other grounds by *Garretson v. Mountain W. Farm Bureau Mut. Ins. Co.*, 234 Mont. 103, 105, 761 P.2d 1288, 1289 (1988)). D&F directs our attention to *Cape France Enterprises v. In re Estate of Peed*, where we explained:

13

> Courts may determine that an act is "impossible" in legal contemplation when it is not practicable. Such an act is impracticable when it can only be done at an excessive, unreasonable and unbargained-for cost. While the doctrine of impossibility or impracticability is not set in stone, it is applied by courts where, aside from the object of the contract being unlawful, the public policy underlying the strict enforcement of contracts is outweighed by the senselessness of requiring performance.

*Cape France Enterprises. v. In re Estate of Peed*, 2001 MT 139, ¶ 23, 305 Mont. 513, 29 P.3d 1011.

¶52 The District Court's observation that it would be impossible to plant seed in immovable rock operated to illustrate that D&F's performance was acceptable within the contract terms under the circumstances. Impossibility is a defense to performance, *see Cape France*, ¶ 23, it is not a defense to a claim alleging poor *quality* of performance. D&F performed. It did not try to escape performance by claiming performing would be physically impossible or financially too onerous—defenses it may have asserted had it refused the job upon viewing the field, as CNJ argues it should have done. Rather, it performed to the best of its ability within the constraints imposed by its equipment, the field conditions, and the decisions made by Circle S and CNJ. We conclude the District Court did not clearly err when it found that D&F did not materially breach the contract; so neither impossibility nor quality of performance are issues here.

¶53 *ISSUE 2. Did D&F's failure to get the seed to the proper depth prevent CNJ from harvesting the crop during harvest season and proximately cause CNJ's damages?*

14

¶54 Because we conclude the District Court did not clearly err when it determined that D&F did not materially breach its contract with CNJ, we need not reach the second issue, which focuses on causation and damages.

¶55 Affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ BETH BAKER
/S/ PATRICIA COTTER